**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF KENTUCKY**
**LEXINGTON DIVISION**

IN RE:

JAMES H. PATTERSON                                                                              CASE NO. 12-53061

DEBTOR

MARRILLIA INTERESTS, LLC                                                                    PLAINTIFF

V.                                                                                                             ADV. NO. 13-5028

JAMES H. PATTERSON                                                                            DEFENDANT

**MEMORANDUM OPINION**

      This adversary proceeding arises out of a dispute between a general contractor, Marrillia Interests, LLC, and its subcontractor, J.P. Concrete Consulting, Inc., owned by the Defendant, Debtor James H. Patterson, over the subcontractor's failure to pay the statutorily required wage to one of the subcontractor's employees. The Plaintiff was obligated to pay the difference in statutory wages owed to the subcontractor's employee as a result of the subcontractor's failure to pay the appropriate wage. The Plaintiff now alleges that the Defendant owes it a non-dischargeable debt of $14,416.38 based on the Defendant's own fraudulent conduct pursuant to §§ 523(a)(2)(A) and 523(a)(4).

      A trial was conducted on April 10, 2014. Upon consideration of the parties' stipulation of facts, testimony and exhibits admitted into evidence, arguments of counsel, and the record, the Court finds the Plaintiff failed to meet its burden of proof and the Defendant is entitled to judgment.

1

I.      **FACTS AND PROCEDURAL HISTORY.**

   A.      **The Lexington Projects and Prevailing Wage Determination.**

Marrillia Interests, LLC ("Plaintiff") is a Kentucky limited liability company managed by Joshua Carl Marrillia ("Marrillia"). The Defendant, Debtor James Patterson ("Patterson"), was the President, sole officer, and owner of J.P. Concrete Consulting, Inc. ("JPCC"), which also did business as JPC, Inc.

The Plaintiff and JPCC collaborated on three construction projects for the Lexington-Fayette Urban County Government ("City"), and one project in Louisville, Kentucky, over a period of approximately eighteen months in 2010 and 2011. The first project, the Lexington Streetscape Cheapside Park ("Cheapside Project"), began in early January 2010 and was completed in the Spring of 2010. The second project, the Streetscape Phase One Improvements-Vine Street ("Vine Street Project"), started around March 2010 and was completed in late Summer of 2010. The third project, the Maxwell Street Sidewalk and Bike Lane Project ("Maxwell Street Project"), started in the Fall of 2010 and was completed in the Spring of 2011. The Parklands of Floyds Fork project in Louisville, Kentucky ("Louisville Project") began in the Fall of 2010. Although only two of the four contracts are in the record,[1] it is undisputed that JPCC was a subcontractor for the Plaintiff on all four projects.

The dispute in this matter involves the wages paid to one of JPCC's employees, Carl Wells ("Wells"), who performed work for JPCC on all three Lexington projects. Contractors employed on the Lexington projects were required to pay a statutorily required rate known as the "Prevailing Wage." The Prevailing Wage determination is made by the Kentucky Labor Cabinet

---

[1] The only contracts in the record relate to the Cheapside Project and the Louisville Project.

2

(the "Cabinet") in accordance with KY. REV. STAT. §§ 337.505 to 337.550. The Cabinet sets the regular wages and fringe benefits for laborers employed. The wage rates are categorized by the type of project, i.e. Building Construction, Highway Construction, or Heavy Construction, and type of employee.

This conflict arises because Wells was paid the Prevailing Wage for a cement mason, not the higher rate for a cement finisher. Marrillia, the Plaintiff's manager and the only witness called on the Plaintiff's behalf, testified that the Plaintiff either provided or made available to JPCC copies of the contract documents, including the specifications and plans related to each project. Marrillia testified these documents would have included general information on the Prevailing Wage applicable for all laborers employed on the projects.

Patterson testified that he knew the Prevailing Wage applied for the Lexington projects and he had a statutory and contractual obligation to comply. JPCC's bids on the Lexington projects were not broken down on a per employee basis, but Patterson testified JPCC considered the Prevailing Wage in its calculations. The Plaintiff then used the bids provided by JPCC for its own submission to the City and was awarded the work on the three Lexington projects.

A cement mason on the Vine Street Project is entitled to a Prevailing Wage base rate of $15.51 and fringe benefit of $0.59 ($16.10 per hour) according to the September 26, 2008 Kentucky Labor Cabinet Prevailing Wage Determination No. CR-4-008 that denotes the project as "HH" for "Heavy Highway." The same Prevailing Wage Determination pays a cement finisher included in the category "Heavy Highway Group 4" a Prevailing Wage base rate of $20.91 and fringe benefit of $9.40 ($30.31 per hour). Undisputed testimony indicated the Cheapside Project had the same Prevailing Wage calculations, but the Prevailing Wage amounts changed for the Maxwell Street Project, as explained further below.

3

JPCC employed Wells to work on the Lexington projects and paid Wells $16.00 per hour for each project.[2] This rate was approximately the Prevailing Wage of a cement mason, although the testimony and information submitted did not explain the work of a cement mason compared to a cement finisher. The Plaintiff and JPCC at least accepted Wells should have received the higher Prevailing Wage of cement finisher at some time during work on the Maxwell Street Project.

### B.    The Maxwell Street Project and Prevailing Wage Errors.

The City began to require certified payroll records on a monthly basis as part of the payment application process on the Maxwell Street Project. On October 7, 2010, Judith Wurmser ("Wurmser"), an office manager for the Plaintiff,[3] sent an email to the Plaintiff's subcontractors containing information to assist with completing the certified payroll. The October 7 email included the September 26, 2008 Kentucky Labor Cabinet Prevailing Wage Determination No. CR-4-008.[4] Wurmser sent an email to Patterson on October 11, 2010, seeking the status of JPCC's payroll with the same Prevailing Wage Determination attached.

On October 25, 2010, November 2, 2010, and November 4, 2010, Wurmser sent emails to subcontractors with the subject line: "Maxwell Street Certified Payroll – CORRECTION REQUIRED." The October 25 email notified the subcontractors regarding "some confusion about the certified payroll" for the Maxwell Street Project. Wurmser pointed out that the Maxwell Street Project is labeled "Heavy Highway (not Building)" and "the $16.10

---

[2] The parties jointly stipulated that JPCC paid Wells $16.00 per hour on each project. Despite jointly stipulating this fact, Patterson argued and testified at trial that he paid $16.10 per hour. This distinction has no effect on the result as the parties agree Wells was paid the rate of a cement mason.

[3] Wurmser was not subpoenaed to testify at trial or called as a witness by either party.

[4] Like the Vine Street Project, the Prevailing Wage Determination also characterized the Maxwell Street Project as "Heavy/Highway."

4

labor/concrete rate is incorrect." Wurmser further indicated that the email attached a "revised wage-rate scale for the certified payroll" that "replaced the one issued with the bid documents."

The attachment was one page that appears to come from the Cabinet's website. The attachment provided the Prevailing Wage rates as of July 1, 2009, for various counties, including Fayette, classified by groups of laborers. Wurmser asked the subcontractors to "make the appropriate adjustments" using the attached rates. "Laborers: Group 1" is highlighted with a Prevailing Wage base rate of $20.36 and fringe benefits of $9.90 ($30.26 per hour). She further requested that the subcontractors, "for verification of compliance with the pay standards for this project, submit a copy of the employee's pay stub or corrected certified payroll records to Celia Moore or me." She concluded: "I apologize for the confusion and appreciate your cooperation."

The November 2 email advised the subcontractors that Wurmser was "waiting for direction from [the City] re: the change order, which may impact how you implement the higher wage scale." She also told the subcontractors that the "attached revised wage rate scale will replace the one issued with the bid documents." The attachment was the same as the attachment to the October 25 email.

The November 4 email asked that all submitted and subsequent payroll records reflect the revised wage rate. Wurmser further requested that the subcontractors make the needed corrections and submit an original and a copy to her as soon as possible.

According to Marrillia, Wurmser's emails with the same subject line – "Maxwell Street Certified Payroll – CORRECTION REQUIRED" – address two mistakes. First, the City erroneously provided an out of date Prevailing Wage Determination to the Plaintiff for the Maxwell Street Project, which Wurmser transmitted to the subcontractors and JPCC with the October 7 and October 11 emails. Marrillia testified that the City notified the Plaintiff of the

5

error in October 2010 and the need to pay the correct Prevailing Wage to all affected employees. The new rates increased the total Prevailing Wage for a cement finisher from $30.31 to $31.16 per hour. The City agreed to take responsibility for the mistake and reimburse the Plaintiff, and thus the subcontractors, for the difference.

The second error relates to the wages paid to Wells. According to Marrillia, after the City reviewed JPCC's certified payroll records, it notified the Plaintiff that JPCC was incorrectly paying its employees $16.10 an hour, presumably because of an incorrect categorization of the project as "Building" instead of "Heavy Highway."

On November 23, 2010, Wurmser sent Patterson an email asking him to "look at group 4" and attached the same page attached to the October 25 and November 2 emails. The November 23 attachment did not, however, highlight Group 1. Group Four on the attachment lists a Prevailing Wage base rate of $21.26 and fringe benefits of $9.90. Also, the November 23 attachment includes a handwritten notation of the total per hour wage for Group 4 of $31.16 and the words "cement finisher."

A facsimile stamp shows the October payroll records were faxed to the Plaintiff on November 23, 2010, the same day as the last email from Wurmser. The Exhibits reflect JPCC submitted the following payroll records for the Maxwell Street Project certified by Patterson as President of JPCC:

| **Date of Certification** | **Amount Paid** | **Pay Period** |
|---|---|---|
|  | $31.16 | Period ending October 1, 2010 |
| October 23, 2010 | $30.26 | October 4-8, 2010 |
| October 22, 2010 | $31.16 | October 13-17, 2010 |

6

| January 7, 2011 | $31.16 | November 29-December 3, 2010 |
| --- | --- | --- |
| March 5, 2011 | $31.16 | February 28-March 5, 2011 |
| March 12, 2011 | $31.16 | March 6-March 12, 2011 |
| March 30, 2011 | $30.26[5] | March 28 – April 1, 2011 |
| April 2, 2011 | $31.16 | March 27-April 2, 2011 |
| April 9, 2011 | $31.16 | April 3 – April 9, 2011 |
| April 30, 2011 | $31.16 | April 24 – April 30, 2011 |

Notwithstanding JPCC's certification that Wells was paid the rate of a cement finisher on the Maxwell Street Project, it is undisputed that JPCC actually paid Wells at the cement mason rate of $16.00 per hour. Patterson testified that Wurmser requested revised payroll records when she notified JPCC of the City's mistake and the classification error for Well's hourly rate. Patterson explained that the revised information was necessary to allow the Plaintiff to seek payment from the City.

JPCC also provided Plaintiff with copies of two checks dated November 15, 2010, made payable to Wells, as additional proof for the City of the required make-up payments for the payrolls ending on October 1, 2010, October 8, 2010, and October 15, 2010. Sherri Patterson, JPCC's bookkeeper and Patterson's wife ("Sherri"), explained that the checks were issued in two different amounts on the same day because of the confusion about the appropriate Prevailing Wage. According to Sherri, Wurmser informed her that the amount was incorrect on the first check and thus she prepared the second check at Wurmser's request.

---

[5] There was no explanation why this payroll used the older Prevailing Wage rate.

Sherri also testified that she informed Wurmser that JPCC intended to hold the corrected check until the City paid the Plaintiff and the Plaintiff paid JPCC.  Patterson confirmed in his testimony that JPCC did not have the cash flow to honor the reimbursement check at the time it was issued and he informed both Wurmser and Wells that JPCC would hold the check.  Patterson claims the Plaintiff never passed on the reimbursed funds for Wells because of the dispute over the Louisville Project hereafter described.  The check was never negotiated.

The Plaintiff asserts that it did pass on the reimbursement for Wells as part of a payment of $15,507.58 on December 15, 2010.  On December 14, 2010, JPCC submitted invoice no. 13089 for $6,692.66 that indicated it was a "CHANGE ORDER FOR DIFFERENCE IN WAGE RATES."  Marrillia testified that he paid this invoice the next day as part of the $15,507.58 payment, a deviation from standard practice, because Patterson informed him that JPCC was having a "cash flow issue" and needed money quickly.

Testimony from Patterson and Sherri disputed Marrillia's claim that the December 15, 2010 payment addressed the change order invoice.  They testified the December 15, 2010 payment reflected payment for prior invoices for the Lexington projects and Sherri indicated it was recorded that way in JPCC's financial records.  Marrillia testified that the check stub for the December 15, 2010 payment shows the payment was intended to cover the $6,692.66 invoice, but the Plaintiff, the party with the burden of proof, did not produce the check stub to confirm this testimony.

### C.    The Cabinet Investigation.

The Cabinet investigated JPCC and ultimately decided Wells was underpaid for the work he performed on all three of the Lexington projects.  On July 25, 2012, the Cabinet directed JPCC to pay Wells additional wages as follows: (1) $3,577.50 for work on the Cheapside

8

Project; (2) $7,155.00 for the Vine Street Project; and (3) $3,683.77 for the Maxwell Street Project. Patterson does not contest the Cabinet's decision, but he asserted that at all times he believed he was paying Wells the correct Prevailing Wage for the Lexington projects; to the extent he was not, he made a mistake.

On September 28, 2012, the Cabinet issued a citation to JPCC for failing to comply with its order and levied a fine of $200.00 per project. Contractors and subcontractors are jointly and severally liable to pay the Prevailing Wage, so the Plaintiff satisfied the outstanding wages owed to Wells on October 22, 2012, in the full amount of $14,416.27 (the "Wage Debt").

### D. JPCC's Default on the Louisville Project.

The relationship between Plaintiff and JPCC was further damaged by disputes related to the Louisville project. On November 24, 2010, the Plaintiff sent JPCC a notice of default on the Louisville Project. On January 12, 2011, the Plaintiff notified JPCC that the Plaintiff would not release any money pending receipt of funds from JPCC's insurance carrier. Further, "as a remedy, Marrillia has taken the position that it will off-set the cost in excess of the subcontract price against any monies due JPC, Inc., under the Subcontract Agreement for the Parklands of Floyds Fork and under any other contract between Marrillia and JPC, Inc." At the time, the Plaintiff owed JPCC approximately $48,909.66 for work completed on the Vine Street Project and the Maxwell Street Project.

JPCC continued to do work for the Plaintiff until May 2011, apparently with the hope that the Plaintiff would pay some or the entire amount due. In May 2011, the Plaintiff and JPCC agreed in writing that the Plaintiff would setoff the damages arising from JPCC's default under the contract for the Louisville project from money the Plaintiff owed JPCC. Therefore, the final payment from Plaintiff to JPCC was the December 15, 2010 payment of $15,507.58.

    E.    **JPCC's Dissolution and Patterson's Bankruptcy.**

JPCC dissolved in late 2011. The Plaintiff filed a Kentucky state court complaint in September 2012 seeking to recover the Wage Debt from Patterson. Patterson then filed for chapter 13 bankruptcy on December 4, 2012, which converted to chapter 7 on May 1, 2013. The Plaintiff filed a proof of claim for the Wage Debt based on "fraud" and then filed this adversary proceeding on August 8, 2013, seeking a determination that the Wage Debt is non-dischargeable.

The Court conducted a trial on April 10, 2014, and the matter was submitted for a decision.

**II.**    **DISCUSSION.**

The Court has jurisdiction pursuant to 28 U.S.C. §1334. This is a core proceeding pursuant to 28 U.S.C. §157(b). Venue is proper pursuant to 28 U.S.C. §1409.

    A.    **§ 523(a)(4).**

The Plaintiff filed its Complaint arguing that Patterson owes the Wage Debt and the obligation is non-dischargeable pursuant to §§ 523(a)(2)(A) and 523(a)(4). The Plaintiff conceded at trial that it did not intend to proceed under § 523(a)(4). Thus, the Court will only analyze the facts pursuant to the Plaintiff's request for judgment under § 523(a)(2)(A).

    B.    **§ 523(a)(2)(A).**

The issue remaining is whether Patterson has a non-dischargeable obligation to the Plaintiff for the Wage Debt pursuant to § 523(a)(2)(A). There is no dispute that JPCC is liable to the Plaintiff for the Wage Debt, but JPCC is dissolved and apparently judgment proof. Hence the Plaintiff seeks to collect the Wage Debt from Patterson based on a theory that Patterson is individually liable for the Wage Debt.

### 1. **An individual representative of an entity is personally liable for his tortious conduct.**

Although Patterson is shielded from JPCC's contractual liability to the Plaintiff by the corporate form, Patterson is responsible for his own tortious conduct. "[W]hile an agent or corporate officer is normally not liable for the debts or contractual obligations of the principal, an agent or corporate officer is not immune from liability for his own intentional misconduct or for negligence based upon a breach of his own duty." *Young v. Vista Homes, Inc,* 243 S.W.3d 352, 363 (Ky. App. 2008). *See also Forsyth v. Heinz (In re Heinz)*, Case No. 11-5009, 2012 WL 137563 *6 n. 2 (Bankr. E.D. Tenn. 2012) (in a § 523(a)(2)(A) action, the corporate status of the company does not shield the debtor from individual liability to the extent that the debtor participated in the commission of a tort such as fraud or misrepresentation).

### 2. **The Plaintiff bears the burden of proof under § 523(a)(2)(A).**

The Plaintiff must meet its burden to prove by a preponderance of the evidence that Patterson (not JPCC) obtained "money, property, services, or an extension, renewal, or refinancing of credit" from the Plaintiff by "false pretenses, false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." § 523(a)(2)(A); *see also Grogan v. Garner*, 489 U.S. 279 (1991). Non-dischargeability is disfavored, so questions are resolved in favor of the debtor. *Pazdzierz v. First American Title Insurance Company (In re Pazdzierz)*, 718 F.3d 582, 586 (6th Cir. 2013).

To prevail, the Plaintiff must prove:

1. Patterson obtained money through a material misrepresentation that, at the time, Patterson knew was false or made with gross recklessness as to its truth;

2. Patterson intended to deceive the Plaintiff;

11

    3.    The Plaintiff justifiably relied on the false representations; and

    4.    The Plaintiff's reliance was the proximate cause of its loss.

*Rembert v. AT&T Univ's Card. Serv's, Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1988).

### 3. **Patterson's Motion for Directed Verdict is denied.**

The Court must first address Patterson's oral motion for a directed verdict made at the close of the Plaintiff's evidence. The Court heard arguments and deferred decision until after completion of the case. The motion is now ripe for determination.

The same standard is applied when examining both summary judgment motions and motions for directed verdicts, i.e. "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Bush v. Bush (In re Bush),* 154 B.R. 69, 70 (Bankr. S.D. Ohio 1993) (*citing Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989)). Patterson argues that that he is entitled to judgment because the Plaintiff did not prove Patterson received anything of value as a result of his allegedly fraudulent conduct, that Patterson made any misrepresentations prior to October 2010, or that there is any evidence of intent to defraud.

Patterson's argument that he did not obtain anything of value is not persuasive. Marrillia testified that he would not have paid JPCC for the work on the Lexington Projects if he had known prior to this time that JPCC was not paying Wells the correct Prevailing Wage. The only contracts in the record, the contract for the Cheapside Project and the Louisville Project, allow the Plaintiff certain remedies if proper wages are not paid to employees. Included within those remedies is authority to withhold payment. If Patterson engaged in the alleged fraudulent conduct, thereby leading the Plaintiff to pay JPCC on a belief that it was in compliance, then

12

Patterson, as the sole owner of JPCC, did obtain value as a result of his allegedly fraudulent conduct.

Further, at the close of the Plaintiff's case, there still remained genuine issues of material fact as to misrepresentations made and Patterson's intent, discussed more fully below. Thus, Patterson's oral motion for a directed verdict is denied.

### 4. There is no evidence that Patterson knowingly made false misrepresentations about the Prevailing Wage prior to October 25, 2010.

The Plaintiff argues that Patterson made false representations about the Prevailing Wage he paid Wells to induce payment from the Plaintiff. The Plaintiff produced the certified payroll records and the copy of the check payable to Wells to show Patterson made representations that he was paying Wells a total of $16.10 per hour as a cement mason rather than $30.31 per hour as a cement finisher. This information came after October 25, 2010, so it provides no support for a claim of false statements before that date.

The Plaintiff also argues that because Patterson knew JPCC was required to pay a statutory Prevailing Wage and represented contractually that JPCC would pay appropriate wages to its employees, then the subsequent conclusion by the Cabinet that JPCC failed to pay the correct Prevailing Wage makes Patterson's statements for JPCC false. Even assuming that JPCC's contractual obligation to pay a lawful wage is construed as a representation by Patterson individually, and that representation is false based on the Cabinet's conclusions that the appropriate wage was not paid, this is insufficient to support a judgment for fraud. Section 523(a)(2)(A) requires that Patterson "knowingly" make a false representation, or at least act with gross recklessness. There is no evidence that the errors during the Maxwell Street Project were made in the Cheapside Project and Vine Street Project until the Cabinet made its findings in the

13

Fall of 2012 and Patterson credibly explained that prior to October 2010, he did not know of the error and made an honest mistake.

The distinction between a cement mason and a cement finisher is not clear and neither party could satisfactorily explain the difference. Further, although Marrillia testified that it is the subcontractor's responsibility to contact the Cabinet if there are doubts as to the correct Prevailing Wage, if Patterson thought it was correct to pay Wells as a cement mason, then he would have no need to contact the Cabinet. Therefore, it is not difficult to conclude that Patterson did not knowingly or with gross recklessness make a false representation.

JPCC might have benefitted from a more thorough review of the specifications or an inquiry to the Cabinet regarding the appropriate rate, but there is no evidence to suggest that the failure to take such actions rises to the level of intentional misconduct or gross recklessness. Patterson's testimony that he thought he was acting appropriately, and any discrepancy was either a mistake or taken with the knowledge of the Plaintiff, is accepted as credible.

The Plaintiff has not met its burden to prove that Patterson acted in a manner that would create a non-dischargeable liability for the Wage Debt at least up to October 25, 2010.

### 5. **There is insufficient evidence to conclude that Patterson acted with intent to defraud after October 25, 2012.**

The facts show that Patterson knew Wells was entitled to receive payment as a cement finisher on the Maxwell Street Project on and after October 25, 2010, yet JPCC only paid Wells $16.00 per hour. Further, Patterson, as President of JPCC, certified numerous payroll records and provided a copy of a check indicating that he paid Wells either $30.26 or $31.16 per hour as a cement finisher on the Maxwell Street Project. The issue is whether these acts were intended to falsely or fraudulently induce the Plaintiff to transfer value to Patterson.

14

The evidence is sufficient to refute any ill intent. Patterson provided a credible explanation for the discrepancy between the certified payroll provided to the Plaintiff and the wage paid to Wells, which was bolstered by evidence in the record. Patterson and his wife testified that Wurmser knew JPCC was merely providing revised payroll records and a copy of an undelivered check made payable to Wells because the City would only disburse funds as a reimbursement.[6]

According to Patterson and Sherri, the Plaintiff, at least through Wurmser, knew JPCC and Patterson never intended to deliver the check to Wells until the Plaintiff passed on the reimbursement from the City to JPCC. Also, Patterson only signed off on the numerous post-October 25, 2010, certified payroll records so the Plaintiff could submit requests for payment from the City. The emails in October and November of 2010 support the assertions that JPCC was only correcting the October payroll records in response to Wurmser's requests for revisions, not to deceive the Plaintiff. Wurmser's admission that the Prevailing Wage changes were confusing lends further support to the Defendant's testimony.

Patterson also explained that the Plaintiff knew it could not immediately pay the higher cement finisher rate to Wells on the Maxwell Street Project due to insufficient cash flow. In October 2010, and the months that followed, JPCC was strapped for cash. It was owed almost $50,000.00 from the Plaintiff, but the Plaintiff withheld funds due to its setoff claim. This ruling does not fault the Plaintiff for enforcing its perceived contractual rights, despite Patterson's attempt to portray the Plaintiff in a negative light. The actions do, however, support Patterson's

---

[6] The explanation raises some concern regarding an apparent attempt to induce payment from the City, but that issue does not affect the dispute between these parties.

claims that the Plaintiff knew the certified payroll records, and copy of the check, did not mean Wells was paid the higher contract rate.

The Plaintiff tried to prove it did pass on the reimbursement for Wells as part of the payment of $15,507.58 on December 15, 2010. The record shows, however, that as of December 15, 2010, there were outstanding invoices from JPCC to the Plaintiff on the Maxwell Street Project in excess of $30,000.00. Nothing in the record proves the change order invoice was part of this payment other than Marrillia's disputed testimony. The check stub could have settled the dispute, but it was not produced. The Plaintiff, as the party with the burden of proof and direct access to the check stub, must suffer the consequences of this missing evidence. The Plaintiff has failed to prove Patterson had intent to defraud.

## Conclusion

The Plaintiff took on a significant and difficult burden when it brought a claim directly against Patterson. The facts could easily support a breach of contract claim against JPCC, but the Plaintiff has failed to prove by a preponderance of the evidence that Patterson, in his individual capacity, acted falsely and/or fraudulently such that he is personally obligated on a non-dischargeable debt. Therefore, it is ORDERED that JUDGMENT is GRANTED in favor of the Defendant James Patterson.

The foregoing constitutes the Court's findings of fact and conclusions of law. In reaching the conclusions found herein, the Court has considered all of the evidence, exhibits, and arguments of counsel, regardless of whether or not they are specifically referred to in this decision. A separate Order shall be entered accordingly.

---

**The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and electronically entered by the Clerk in the official record of this case.**



Signed By:
*Gregory R. Schaaf*
**Bankruptcy Judge**
Dated: Thursday, May 01, 2014
(grs)